UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
─────────────────────────────────────────

UNITED STATES OF AMERICA,

v.                                                  8:09-CR-0162
                                                    (GTS)
DETRON J. PARKER; TRAVIOUS PARKER;
and KEENAN JOHNSON,

                          Defendants.
─────────────────────────────────────────

APPEARANCES:                                OF COUNSEL:

HON. ANDREW T. BAXTER                       DANIEL C. GARDNER, ESQ.
   United States Attorney for the N.D.N.Y.
   Counsel for the Government
James T. Foley U.S. Courthouse
Albany, NY 12207-2924


LAW OFFICE OF BRIAN P. BARRETT             BRIAN P. BARRETT, ESQ.
   Counsel for Defendant Detron Parker
Office of Brian P. Barrett
72 Olympic Drive
Lake Placid, NY 12946


LAW OFFICE OF FRANK G. ZAPPALA             FRANK G. ZAPPALA, ESQ.
   Counsel for Defendant Travious Parker
P.O. Box 2886
142 Margaret Street
Plattsburgh, NY 12901


HON. ALEXANDER BUNIN                       PAUL EVANGELISTA, ESQ.
   Federal Public Defender for the N.D.N.Y.   Assistant Federal Public
                                              Defender
   Counsel for Defendant Keenan Johnson
39 North Pearl Street, 5th Floor
Albany, NY 12207


HON. GLENN T. SUDDABY, United States District Judge

<u>**DECISION and ORDER**</u>

Currently before the Court in this criminal proceeding against Detron J. Parker, Travious Parker, and Keenan Johnson ("Defendants") for conspiracy to provide contraband to Travious Parker while in prison, and providing that contraband, between March 5, 2009 and March 8, 2009, at the Federal Correctional Facility at Ray Brook ("FCI Ray Brook") are eighteen pretrial motions filed by Defendants.  The Government has opposed some of Defendants' motions, and not opposed others.  For the reasons set forth below, Defendants' motions are granted in part and denied in part.

I.     **BACKGROUND**

Defendant Detron Parker has filed the following thirteen motions: (1) a motion to dismiss the indictment pursuant to Fed. R. Crim. P. 12(b) based on insufficient evidence before the grand jury (Dkt. Nos. 15-16); (2) a motion to inspect the Grand Jury minutes, pursuant to Fed. R. Crim. P. 6(e)(3) (Dkt. Nos. 15-16); (3) a motion for discovery and inspection of various information pursuant to Fed. R. Crim. P. 12(b)(4), and 16 (Dkt. Nos. 15-16); (4) a motion to suppress any and all evidence seized by the Government from the vehicle in which Defendant Detron Parker was an occupant, pursuant to Fed. R. Crim. P. 12(b)(3) (Dkt. Nos. 15-16); (5) a motion to suppress the statements attributed to Detron Parker pursuant to Fed. R. Crim. P. 12(b)(3) and 41 (Dkt. Nos. 15-16); (6) a motion to direct the disclosure all exculpatory material, pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) (Dkt. Nos. 15-16); (7) a motion to direct the early release of all inculpatory material, pursuant to the Jencks Act (Dkt. Nos. 15-16); (8) a motion to direct the Government to specify what evidence of his prior bad acts, if any, it intends to introduce at trial, pursuant to Fed. R. Evid. 404(b) (Dkt. Nos. 15-16); (9) a motion to direct the Government to

instruct the detectives and agents on this case to preserve their original notes (Dkt. Nos. 15-16); (10) a motion to preclude the use of the Government's audio tapes and/or transcripts of those tapes (Dkt. Nos. 15-16); (11) a motion to conduct an individualized voir dire (Dkt. No. 36); (12) a motion to suppress the out-of-court statements of Defendant Detron Parker's indicted or unindicted co-conspirators as hearsay pursuant to Fed. R. Evid. 801(d)(2)(E) (Dkt. No. 41); and (13) a motion, pursuant to Fed. R. Crim. P. 16(a)(1)(G), to direct the Government to disclose a written summary of any expert testimony that it intends to introduce at trial pursuant to Fed. R. Evid. 702, 703 and/or 705 (Dkt. No. 42).[1]

Defendant Johnson has filed the following five motions: (1) a motion to suppress evidence seized from the vehicle that he was driving, pursuant to Fed. R. Crim P. 12(b)(3) (Dkt. No. 20); (2) a motion to suppress statements made by him to law enforcement officers under *Miranda* (Dkt. No. 20); (3) a motion to suppress the out-of-court statements of his co-Defendants as hearsay pursuant to Fed. R. Evid. 801(d)(2)(E) (Dkt. No. 27); (4) a motion to direct the Government to disclose information, pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), concerning the delivery by two females of contraband to the Ray Brook facility on the date of the arrest (Dkt. No. 27); and (5) a motion to sever his action from the actions against Defendant Johnson's co-Defendants, pursuant to Fed. R. Crim. P. 14(a) (Dkt. No. 27).

## II.    DEFENDANT DETRON PARKER'S MOTION TO DISMISS

Defendant Detron Parker has filed a motion to dismiss the indictment pursuant to Fed. R. Crim. P. 12(b) based on insufficient evidence before the grand jury.  In his motion, he argues that

---

[1]      On June 15, 2009, Defendant Detron Parker also filed a motion a bill of particulars pursuant to Fed. R. Crim. P. 7(f).  (Dkt. Nos. 15-16.)  However, at the suppression hearing on July 16, 2009, Defendant Detron Parker withdrew that motion.

(1) the indictment merely tracks the statutory language, (2) the indictment lacks any factual allegation of either an illegal agreement or the providing of  contraband to prisoners, and (3) Detron Parker has not been provided, through discovery, of any evidence that would support the charges against him.  (Dkt. No. 16, ¶¶ 5-17.)  The Government has opposed the motion.

The Second Circuit has consistently held that "an indictment [which] tracks the statutory language and specifies the nature of the criminal activity . . . is sufficiently specific to withstand a motion to dismiss." *U.S. v. Carr*, 582 F.2d 242, 244 (2d Cir. 1978).  In addition, the Court has reviewed, and found sufficient, the Grand Jury minutes.

For all these reasons, the Court denies Detron Parker's motion to dismiss the indictment.

## III.     DEFENDANT DETRON PARKER'S MOTION TO INSPECT THE GRAND JURY MINUTES

Defendant Detron Parker's motion to inspect the Grand Jury minutes, pursuant to Fed. R. Crim. P. 6(e)(3).  The Government has not opposed the motion.  As a result, Defendant Detron Parker's motion to inspect the Grand Jury minutes is granted.

## IV.     DEFENDANT DETRON PARKER'S MOTION TO DISCLOSE EXPERT TESTIMONY

Defendant Detron Parker has filed a motion pursuant to Fed. R. Crim. P. 16(a)(1)(G),[2] to direct the Government to disclose a written summary of any testimony that it intends to introduce at trial pursuant to Fed. R. Evid. 702, 703 and/or 705.  More specifically, it requests that the summary include, but not be limited to, "the identity of the expert witnesses, a description of the opinions of any purported experts (including laboratory personnel and/or law

---

[2]       The Court assumes that defense counsel's reference to Fed. R. Civ. P. 16(a)(1)(*E*) is a typographical error.

enforcement officers), and the bases and reasons for such opinions, and the qualifications of any such experts." (Dkt. No. 42 at 1-2.) The Government does not oppose the motion. Instead, it states, "The Government intends to call Cindy Vitale, DEA Forensic Chemist, to discuss her chemical analysis of the substance discovered in the Wall-E' balloons." (Dkt. No. 44, at 10.)

As a result, the Court grants Defendant Detron Parker's unopposed motion to direct the disclosure of expert information. The Court directs the Government to, within seven (7) days of the date of this Decision and Order, provide to defense counsel in writing the remaining information requested by Defendant Detron Parker, including a description of the opinions of Ms. Vitale, the bases and reasons for her opinions, and her qualifications.

## V.    DEFENDANT DETRON PARKER'S SEVERAL OTHER MOTIONS FOR DISCOVERY, INSPECTION, DISCLOSURE AND/OR PRESERVATION

Defendant Detron Parker has made the following other motions for discovery, inspection, disclosure and/or preservation: a motion for discovery and inspection of various information pursuant to Fed. R. Crim. P. 12(b)(4), and 16; a motion to direct the disclosure of all exculpatory material, pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963); a motion to direct the early release of all inculpatory material, pursuant to the Jencks Act; a motion to direct the Government to specify what evidence of his prior bad acts, if any, it intends to introduce at trial, pursuant to Fed. R. Evid. 404(b); and a motion to direct the Government to instruct the detectives and agents on this case to preserve their original notes.

The Government has responded that certain of the information requested does not exist (e.g., *Brady* material), that the information that does exist either has been provided to Defendants or is in the process of being provided to Defendants (e.g., photocopies of physical evidence, as well as a surveillance video of the stop). In addition, the Government has indicated that it does

not intend to offer evidence of Defendants' prior criminal history.

As a result, these motions are granted in part and denied in part.  The Government shall continue to comply with its relevant obligations to preserve and disclose the information at issue (e.g., under the Federal Rules of Criminal Procedure, *Brady v. Maryland*, and the Jencks Act).

## VI.   DEFENDANT DETRON PARKER'S MOTION REGARDING THE GOVERNMENT'S AUDIO TAPES

Defendant Detron Parker has filed a motion to preclude the use of the Government's audio tapes and/or transcripts of those tapes.  (Dkt. Nos. 15-16.)  More specifically, Defendant Detron Parker argues that he has been provided with recordings of conversations which are purported to be of himself.  He further argues that portions of the recordings are inaudible.  He therefore requests a hearing to determine the admissibility of audio tapes (which are of Defendant Parker speaking with the prisoner co-conspirator), as well as the admissibility of related transcripts proffered by the Government.

Of course, if the tapes are inaudible, they may not be admissible.  *See United States v. McDonald*, No. 98-1697, 1999 WL 753488, at *2 (2d Cir. Sept. 16, 1999) ("A tape recording is not inadmissible merely because portions of it are inaudible.").  However, "[u]nless the unintelligible portions are so substantial as to render the recording as a whole untrustworthy[,] the recording is admissible, and the decision should be left to the sound discretion of the judge." *McDonald*, 1999 WL 753488, at *2.  It is important to note that, "[i]f a tape recording is probative, it is preferable to admit it even if parts are inaudible." *Id.*  After carefully listening to the audio tapes at issue in camera, the Court finds that the vast majority of the tapes are audible, and that the inaudible portions do not appear particularly material.

As a result, Defendant Detron Parker's motion regarding the Government's audio tapes is

6

denied.  If and when Defendants raise an objection about a specific portion of the Government's transcription of those audio tapes, the Court will consider that objection at that time.

## VII.    DEFENDANT DETRON PARKER'S MOTION TO CONDUCT AN INDIVIDUALIZED VOIR DIRE

Defendant Detron Parker filed a motion to conduct an individualized voir dire.  Upon due consideration, this motion is denied.

## VIII.   MOTIONS OF DEFENDANTS DETRON PARKER AND KEENAN JOHNSON TO SUPPRESS EVIDENCE SEIZED FROM VEHICLE PURSUANT TO FED. R. CRIM. P. 12(b)(3)

Defendant Detron Parker has requested that the Court suppress any and all evidence seized from the vehicle ("Dodge Vehicle") in which he was an occupant on March 8, 2009, pursuant to Rule 12(b)(3) of the Federal Rules of Criminal Procedure.  (Dkt. Nos. 15-16.) Similarly, Defendant Johnson has requested that the Court suppress any and all evidence seized from the Dodge Vehicle that he was driving on March 8, 2009, pursuant to Rule 12(b)(3) of the Federal Rules of Criminal Procedure.  (Dkt. No. 20.)

More specifically, Defendant Johnson argues that, at the time the Dodge Vehicle was stopped, he was "seized" because his continued movement was restricted.  Furthermore, he argues that there was no probable cause to stop the Dodge Vehicle because Defendant Johnson had not violated any section of the Vehicle and Traffic Law to justify a vehicle stop, nor did he or Defendant Detron Parker do anything else to give Lieutenant Robert Helms reasonable suspicion that criminal activity was afoot.  (Dkt. No. 20.)  Moreover, Defendant Johnson argues that, because his arrest occurred prior to the search of and alleged recovery of evidence from the Dodge Vehicle, there was no evidence at the time he was arrested that linked him to the suspected contraband that was allegedly found on the ground in the area of the warehouse.  (*Id*.)

7

As a result, Defendant Johnson argues that the New York State Police did not have probable cause to arrest him, rendering his arrest illegal, and mandating that all evidence seized from the vehicle incident to this illegal arrest be suppressed at trial.  (*Id*.)  Defendant Detron Parker has offered similar arguments.  (*See* Dkt. No. 16, ¶¶ 28-40.)

The Government has opposed both motions.

### A.      Lieutenant Helms' Stop of Defendants Johnson and Detron Parker

"A traffic stop is a limited seizure within the meaning of the Fourth and Fourteenth Amendments to the United States Constitution."  *United States v. Garcia*, 279 F. Supp.2d 294, 298 (S.D.N.Y. 2003) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 [1979]) (other citations omitted).  "Therefore, in order to stop a car, the police must have either probable cause or a reasonable suspicion, based on specific and articulable facts, of unlawful conduct."  *Garcia*, 279 F. Supp.2d at 298 (citations and internal quotations omitted).

"The standard for determining whether a particular stop was justified by reasonable suspicion is an objective one, not dependent on the intentions or motivations of the particular detaining officers."  *United States v. Glover*, 957 F.2d 1004, 1010 (2d Cir. 1992) (internal quotation marks and citations omitted).[3]  "Evidence seized incident to an unlawful traffic stop is subject to the fruit of the poisonous tree doctrine, and may be suppressed."  *Garcia*, 279 F. Supp.2d at 298 (citation and internal quotations omitted).

"The lawfulness of an investigative stop involves a two-part inquiry."  *United States v.*

---

[3]      "In the case of suspected narcotics trafficking, an officer's suspicion will be reasonable if, considering the totality of the circumstances surrounding the stop, the conduct would appear suspect to one familiar with the practices of narcotics couriers, albeit the pattern of behavior is innocuous to the untrained observer."  *Glover*, 957 F.2d at 1010 (internal quotation marks and citations omitted).

*Toole*, 06-CR-6024, 2008 WL 2323362, at *12 (W.D.N.Y. Jan. 11, 2008), *adopted by United States v. Toole*, 06-CR-6024, 2008 WL 2354959 (W.D.N.Y. Jun. 3, 2008).  After a court determines that a police officer's suspicion that the suspect has committed or is about to commit a crime was reasonable, "the court must consider the length of the detention, which 'must be temporary and last no longer than is necessary to effectuate the purpose of the stop.'"  *Toole*, 2008 WL 2323362, at *12 (citing *Florida v. Royer*, 460 U.S. 491, 500 [1983]) (other citation omitted).  "In other words, an investigative stop may not continue indefinitely; at some point, such a stop ceases to be investigative and becomes a de facto arrest."  *Id*. (citing *United States v. Sharpe*, 470 U.S. 675, 685 [1985]).

"The Supreme Court has declined to delineate a 'bright line' time limit beyond which an investigative stop will be considered unreasonable."  *Id*. (citation omitted).  Instead, the Supreme Court has made clear that "'common sense and ordinary human experience' must inform that determination, illuminated by a recognition that 'if the purpose underlying a *Terry* stop-investigating possible criminal activity-is to be served, the police must under certain circumstances be able to detain the individual for longer than the brief time period involved in *Terry*.'"  *Id*. (citing at *Sharpe*, 470 U.S. at 685-86) (other citation omitted).

"Among the factors the court should consider in evaluating the reasonableness of the length of an investigative stop are whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, and whether it was necessary to detain the defendant during that period."  *Id*. (citations and internal quotations omitted).  In addition, the Second Circuit has emphasized that, although no single factor, standing alone, necessarily converts a detention from a *Terry* stop into a *de facto* arrest, detentions involving

"numerous intrusive elements, with little or no reasonable justification," will not be condoned as a *Terry* stop. *Oliveira v. Mayer*, 23 F.3d 642, 646 (2d Cir. 1994), *cert. denied*, 513 U.S. 1076 (1995).

On July 16, 2009, a pretrial hearing was held regarding a number of issues raised by Defendants. During this hearing, Lieutenant Helms, the correctional officer who originally caused Defendant Johnson to stop the Dodge Vehicle on March 8, 2009, provided the following testimony: (1) the area where Defendant Johnson was stopped was government property (Dkt. No. 39, at 8-9, 23-24); (2) there are a number of signs, including one which he approximated to be ten feet high by six feet wide, which indicate, in sum and substance, that the area where Defendant Johnson was stopped is government property, and "that you are exposing yourself to being searched if you enter these grounds" (Dkt. No. 39, at 9-11); (3) individuals may attempt to smuggle contraband into FCI Ray Brook by dropping contraband in discrete areas on the prison grounds that prisoners have access to, like the area behind the Unicor warehouse (*id*. at 12-13); (4) prior to Defendant Johnson being stopped, he entered the main entrance road to the institution, driving slowly, drove past the Unicor parking lot, stopped, turned around back onto the entrance road, stopped, backed up, and then drove along a dirt road, toward the Unicor warehouse (Dkt. No. 39, at 16-17); (5) because it was "out of the ordinary" for a vehicle to stop and back up toward the road leading to the warehouse, he contacted the perimeter security, requesting assistance, because of the Dodge Vehicle's activity (*id*. at 18); (6) there would be no reason for a vehicle to be on the road where Defendant Johnson was driving (*id*. at 20-21); (7) as he was chasing after the Dodge Vehicle, which had driven behind wood trees and out of his sight, he heard a vehicle door slam, and then he saw the Dodge Vehicle moving back down

towards the entrance road (*id*. at 21); (8) he stopped the Dodge Vehicle on foot (*id*.); (9) soon after he stopped the Dodge Vehicle, one SUV obscured the Dodge Vehicle's exit path (*id*.); (10) the Dodge Vehicle had a Virginia license plate (*id*. at 22-23); (11) after stopping the Dodge Vehicle, he approached it and started questioning the occupants (Defendant Johnson and Defendant Detron Parker), asking them, among other things, where they were from, and what they were doing driving on Government property next to a federal prison (*id*. at 22-23); (12) Defendant Detron Parker stated that they drove to the warehouse area because he had to use the bathroom (*id*. at 23); (13) when Lieutenant Helms asked, "Don't you find it odd that you're driving a vehicle that's from Virginia, you're from Rochester, New York and you tell me that you drove to Ray Brook, New York, drove on our grounds where there's signs that say do not enter all over our property, to use the bathroom?" Defendant Detron Parker responded that his brother is incarcerated at the prison, and that he had just spoken with him (*id*. at 23-24); (14) Defendant Detron Parker further stated that he was told by his brother that he would not be able to visit because he was not on the guest list (*id*. at 24); (15) in response, he radioed the control center officers to verify that Defendant Detron Parker had recently spoken with his brother (*id*. at 24-25); (16) upon doing so, because inmate phone calls are recorded, he learned from the control center officers that Defendant Detron Parker had recently spoken with his brother about a jump off, and blue prints being too small (*id*. at 25-26); and (17) based on this information, he notified the operations lieutenant in charge of the interior of the facility and asked him to notify the New York State Police and have them respond to the institution (*id*. at 26).

Based on all of these facts, the Court finds that Lieutenant Helms' suspicion of unlawful conduct was reasonable, and therefore, the stop was not unlawful.  In the alternative, the Court

finds that Defendants implicitly consented to the stop upon entering the property, and therefore it was not unlawful to stop the Dodge Vehicle, because there are (1) signs on the property that indicate that those driving vehicles on the property subject themselves to vehicle searches, (2) armed security guards surrounding the prison adjacent to where Defendant Johnson was driving, and (3) other visible security measures in place, like barbed-wire fencing surrounding the facility.[4]

With regard to the length and manner of the stop, in addition to considering the testimony of Lieutenant Helms, subsequent to the July 16, 2009 hearing, the Court also viewed a video recording, which captured Lieutenant Helms' stop of the Dodge Vehicle, and the events that followed the stop.  The Court finds that, in addition to corroborating much of Lieutenant Helms' testimony, the video recording revealed the following: (1) the Sports Utility Vehicle ("SUV") that arrived at the scene shortly after Lieutenant Helms stopped the Dodge Vehicle angled itself in a position such that both vehicles were heading in roughly the same direction, with the SUV's passenger's side front bumper slightly in front of the Dodge Vehicle's driver's side front bumper; (2) the SUV did not impede Defendant Johnson's ability to drive away down the generous two-

---

[4]        *See Morgan v. United States*, 323 F.3d 776, 778 (9th Cir. 2003) ("Because military bases often warn of the possibility of search as a condition to entry, a warrantless search of a person seeking to enter a military base may be deemed reasonable based on the implied consent of the person searched."); *United States v. Jenkins*, 986 F.2d 76, 79 (4th Cir. 1993) ("Consent is implied by the totality of all the circumstances.  The barbed-wire fence, the security guards at the gate, the sign warning of the possibility of search, and a civilian's common-sense awareness of the nature of a military base-all these circumstances combine to puncture any reasonable expectations of privacy for a civilian who enters a closed military base.") (internal quotation marks and citations omitted); *United States v. Gallock*, 07-CR-0309, 2007 WL 4126071, at *1 (E.D. Cal. Nov. 20, 2007) (finding that, where there were warnings posted on a military based stating that those who entered subjected their vehicle and person to searches, "the government persuasively argue[d] that this defendant impliedly consented to the search by virtue of his entering the military base").

lane road, as evidenced by the fact that, subsequent to the stop, a different vehicle went around

the right side of the Dodge Vehicle (while the Dodge Vehicle's passenger door was open), while

remaining on the roadway; (3) the Dodge Vehicle remained running during the entire duration of

the stop (and, indeed, toward the end of that seventeen-minute period, the officers actually let

Defendant Johnson drive the vehicle over to the side of the road); (4) for a majority of the stop,

Defendants Johnson and Detron Parker remained in the Dodge Vehicle, and Lieutenant Helms

and the officer who had been driving the SUV remained on the sides of the Dodge Vehicle; (5)

within ten minutes of the beginning of the stop, the New York State Police arrived at the scene;

and (6) the entire stop, before the arrest occurred, lasted only about seventeen minutes.

Based on all of these facts, the Court finds that Lieutenant Helms stopped Defendants

Johnson and Detron Parker for only a brief period of time, and only long enough to inquire about

their reasons for being at the facility and driving along the dirt road–i.e., to "diligently pursue a

means of investigation that was likely to confirm or dispel [his] suspicions quickly." *Sharpe*,

470 U.S. at 686.[5]  Based on Defendant Detron Parker's response to the questions, as well as the

fact that he heard a door open and close by the warehouse where Defendant Johnson had driven,

Lieutenant Helms became more suspicious about the Defendants' activities.  Given the proximity

to a prison facility, and the potential for a visitor aiding an escape, or assisting with getting

weaponry or contraband into the facility, this heightened suspicion was reasonable.

In addition, when viewed in the totality of the circumstances, Lieutenant Helms' effort to

verify Defendant Detron Parker's statement that he had recently spoken with his brother was

---

[5]      *See United States v. Sparks*, 03-CR-0269, 2004 WL 307304, at *5 (S.D.N.Y. Feb.
19, 2004) (during traffic stop, officer is permitted to make inquires relating to driver's license
and registration and destination and purpose of trip).

within the scope of a lawful stop and did not amount to a *de facto* arrest.  This is because (1) Lieutenant Helms was only making inquiries regarding Defendant Johnson's and Defendant Detron Parker's identity and purpose for being at FCI Ray Brook so as to alleviate his suspicion created by their conduct under the circumstances, (2) neither Lieutenant Helms nor the officer operating the SUV had their guns drawn, (3) Defendants Johnson and Detron Parker were never placed in handcuffs during the stop, (4) the Dodge Vehicle remained running during the entire stop, (5) the SUV did not impede the Dodge Vehicle's ability to drive away, and (6) only a total of two officers and one vehicle were present during the initial portion of the stop.

Furthermore, upon discovering certain details of the conversation between Defendant Detron Parker and his brother, Lieutenant Helms had probable cause to arrest Defendants, or, at the very least, enough reasonable suspicion to hold Defendants until their activities could be investigated further by the New York State Police.

### B.     Officer Howard's Arrest of Defendants Johnson and Detron Parker

Responding to the call to the scene along with other New York State police officers was New York State Police Investigator Daniel Howard.  (Dkt. No. 39, at 64.)  Officer Howard testified that, upon arriving at the scene, he approached the Dodge Vehicle and spoke with Defendant Johnson, asking him what was going on.  (*Id*. at 65.)  Officer Howard testified that Defendant stated that he and Defendant Detron Parker were "going up to visit an inmate and changed their mind and before they headed back, they wanted to stop and take a leak." (*Id*.) Officer Howard testified that he then walked away from the Dodge Vehicle, up to the warehouse area where the vehicle was seen leaving by Lieutenant Helms.  (*Id*.)

Officer Howard testified that he and another officer searched this area, eventually

14

discovering the following: (1) fresh dirt tracks; (2) a footprint in the soft ground; and (3) a popcorn bag containing some popped popcorn, a rock, and two balloons later determined to be filled with marijuana.  (*Id*. at 66-67.)  Officer Howard testified that he then headed back to the Dodge Vehicle, requesting along the way that Defendants Johnson and Detron Parker be handcuffed and placed under arrest.  (*Id*. at 68.)  Officer Howard further testified that Defendants Parker and Johnson were placed in separate vehicles, and that, when he arrived at the vehicles, he separately Mirandized both men in the respective vehicles where they were being held using Trooper Spadaro's Miranda warning card.  (*Id*. at 69.)  Officer Howard testified that neither Defendant ever requested counsel, and that, after their arrest, he looked into the window of the Dodge Vehicle.  (*Id*. at 70-72.)  Officer Howard testified that, upon looking through the window, he saw a broken balloon as well as a popcorn kernel, a map and a bag which was "like a store-bought balloon bag."  (*Id*. at 72.)

Based on the evidence that was discovered near the warehouse, the Court finds that the New York State Police had probable cause to arrest Defendants Johnson and Parker.[6]  Moreover, to the extent that the items eventually seized were in plain view, a warrant was not required prior to the seizure of these items.  *McCardle v. Haddad*, 131 F.3d 43, 48 (2d Cir. 1997) (a warrant is not required for "searches based on evidence lying in plain view").

---

[6]      "A warrantless arrest is justified if there is probable cause when the defendant is put under arrest to believe that an offense has been or is being committed."  *See United States v. Rodriguez*, 568 F. Supp.2d 396, 398 (S.D.N.Y. 2008) (citing *United States v. Cruz*, 834 F.2d 47, 50 [2d Cir. 1987]).  "Probable cause exists when an officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested."  *Rodriguez*, 568 F. Supp.2d at 398 (citing *Savino v. City of New York*, 331 F.3d 63, 76 [2d Cir. 2003]).  "The presence or absence of probable cause is based on the totality of the circumstances."  *Id*. (citing *Illinois v. Gates*, 462 U.S. 213, 238 [1983]).

In addition, to the extent that the items seized were not in plain view, the seizure of such items was lawful under the automobile exception because there was probable cause to believe that the Dodge Vehicle contained contraband based on the following:[7] (1) the discovery of the contraband inside of balloons placed inside of a popcorn bag in close proximity to the Unicor warehouse; (2) the fact that similar balloons and popcorn remnants could be viewed in plain sight inside the Dodge Vehicle; (3) the fact that Lieutenant Helms witnessed the same vehicle approach the Unicor warehouse and heard a door slam; (4) the fact that only a short time later Lieutenant Helms witnessed the Dodge Vehicle drive away from the Unicor area; and (5) the fact that there were footprints and fresh tire tracks found in the same area only minutes later.

Furthermore, the seizure of such items was lawful because another "exception[] to the warrant requirement is a search incident to a lawful arrest." *Arizona v. Gant*, 129 S.Ct. 1710, 1716 (2009) (citation omitted).  As recognized by defense counsel, the Supreme Court in *Gant* concluded, among other things, "that circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." *Arizona v. Gant*, 129 S.Ct. at 1719 (internal quotation mark and citation omitted).  Here, because  Defendants Johnson and Detron Parker were arrested for drug offenses, there was an evidentiary basis for the search.  *See Gant*, 129 S.Ct. at 1719 (noting that when a party is arrested for a drug offense, there is an evidentiary basis for the search of that party's vehicle because a drug offense is "an offense for which police could . . . expect to find

---

[7]        *See Rodriguez*, 568 F. Supp.2d at 398 (S.D.N.Y. 2008) ("Police officers may conduct a warrantless search of an automobile under the 'automobile exception' to the Fourth Amendment's warrant requirement, when they have probable cause to believe it contains contraband or evidence of a crime.") (citing *United States v. Vassiliou*, 820 F.2d 28, 30 [2d Cir. 1987]).

evidence in the . . . car").

As a result, Defendants' motions to suppress the evidence seized from the Dodge Vehicle are denied.

## IX.   DEFENDANT JOHNSON'S MOTION TO SUPPRESS STATEMENTS MADE BY HIM TO LAW ENFORCEMENT OFFICERS UNDER *MIRANDA*

Defendant Johnson has requested that the Court suppress statements made by Defendant Johnson to law enforcement officials while he was in custody.  (Dkt. No. 20.)  Defendant Johnson argues that his statements should be suppressed because, at the time the statements were allegedly made, (1) he was in custody and subject to interrogation, (2) he was not properly advised of his rights pursuant to *Miranda v. Arizona*, and (3) he did not provide a knowing and voluntary waiver of his right to remain silent.  (Dkt. No. 20.)  As a result, Defendant Johnson argues that any and all statements attributed to him were extracted in violation of his rights under the Fourth, Fifth and Sixth Amendments to the United States Constitution and must be suppressed.  (*Id*.)  The Government has opposed the motion.

As an initial matter, for the reasons stated above in Part II of this Decision and Order, the Court finds that Defendants were neither in custody nor subjected to interrogation prior to their arrest.  Moreover, the Court finds, based on the credible testimony from the pretrial hearing on July 16, 2009, that Defendants Johnson and Detron Parker were advised of their rights under *Miranda* when they were arrested.  The Court also finds, based on the fact that Defendants' *Miranda* rights were read from a standard-issue *Miranda* warning card, that Defendants were properly read their rights under *Miranda*.  Finally, the Court finds, based on the testimony of Lieutenant Helms and Officer Howard, that the statements made by Defendant Johnson and Defendant Detron Parker both prior and subsequent to their arrest were made voluntarily.

17

As a result, Defendant Johnson's motion to suppress the statements that he made to law enforcement officials is denied.

## X.   DEFENDANT DETRON PARKER'S MOTION TO SUPPRESS HIS STATEMENTS PURSUANT TO FED. R. CRIM. P. 12(b)(3) AND 41

Defendant Detron Parker has filed a motion to suppress the statements attributed to Detron Parker pursuant to Fed. R. Crim. P. 12(b)(3) and 41.  The Government has opposed the motion.  For the reasons discussed above in Parts VII and VIII of this Decision and Order, Defendant Detron Parker's motion is denied.

## XI.   MOTIONS OF DEFENDANTS JOHNSON AND DETRON PARKER TO SUPPRESS THE OUT-OF-COURT STATEMENTS OF THEIR CO-DEFENDANTS AS HEARSAY

Defendant Johnson has filed a motion to suppress the out-of-court statements of his co-Defendants as hearsay pursuant to Fed. R. Evid. 801(d)(2)(E).   Similarly, Defendant Detron Parker has filed a motion to suppress the out-of-court statements of his indicted or unindicted co-conspirators as hearsay pursuant to Fed. R. Evid. 801(d)(2)(E).  The Government has opposed both motions.

In support of his motion, Defendant Detron Parker argues that, for a declaration by one defendant to be admissible against a co-defendant under Rule 801, the Court must find that the Government has established by a preponderance of the evidence each of the following facts: (1) that a conspiracy existed; (2) that the defendant and the declarant were members of the conspiracy; and (3) that the statements were made during the course, and in furtherance of, the conspiracy.  (Dkt. No. 41, at 2 [citing *United States v. Tracy*, 12 F.3d 1186, 1196 [2d Cir. 1993].) In support of his request, Defendant Johnson offers a similar argument.  (Dkt. No. 27, at 4.)

Under the rule announced by the Second Circuit in *United States v. Geaney*, 417 F.2d

1116 (2d Cir. 1969), "statements proffered as coconspirator statements may be admitted in evidence on a conditional basis, subject to the later submission of the necessary evidence of those . . . prerequisites." *United States v. Tracy*, 12 F.3d 1186, 1199 (2d Cir. 1993) (quoting *United States v. Geaney*, 417 F.2d 1116, 1120 [2d Cir. 1969], *cert. denied*, 397 U.S. 1028 [1970]) (other citations omitted).  Furthermore, "[t]he decision as to whether the . . . prerequisites have been met, like all other preliminary questions of admissibility, . . . is to be made by the court." *Tracy*, 12 F.3d at 1199.  "If the Government succeeds in persuading the court that the conditionally admitted coconspirator statements were made during and in furtherance of a conspiracy of which both the declarant and the defendant were members, the statements are allowed to go to the jury." *Id*.  "If the court is not so persuaded, it either should instruct the jury to disregard the statements, or, if those statements were so large a proportion of the proof as to render a cautionary instruction of doubtful utility, should declare a mistrial.  *Id*. (internal quotation marks and citations omitted).

Given the apparent likelihood (at least at this point in the action) that the Government will be able to establish by a preponderance of the evidence each of the three facts described above, the Court will admit the audio recordings into evidence on a conditional basis, and then rule on whether the prerequisites have been met at the close of the Government's case-in-chief. As a result, the Court denies the motions to suppress to the extent they seek to preclude such conditional admission, and the Court reserves on the remainder of these two motions to suppress.

## XII.   DEFENDANT JOHNSON'S MOTION TO DISCLOSE *BRADY* INFORMATION

Defendant Keenan Johnson has filed a motion to direct the Government to disclose information, pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), concerning the delivery by two females of contraband to the Ray Brook facility on the date of the arrest.  The Government does

not oppose the motion.  Instead, it states that it will "turn over all material in its possession regarding this incident," including "the sum and substance of any information regarding this incident," including a report should one be generated by FCI Ray Brook.  (Dkt. No. 44, at 10.)

As a result, the Court grants Defendant Keenan Johnson's unopposed motion to direct the disclosure of this *Brady* information.  The Court directs the Government to disclose to defense counsel the sum and substance of any information regarding the incident in question within seven (7) days of the date of this Decision and Order (and any report generated regarding the incident by FCI Ray Brook before trial).

## XIII.   DEFENDANT JOHNSON'S MOTION TO SEVER

Defendant Keenan Johnson has filed a motion for the severance of his action from the actions against his co-Defendants, pursuant to Fed. R. Crim. P. 14(a).  The Government has opposed the motion.

In deciding whether to grant a defendant's motion for severance to call a co-defendant, a district court should consider the following four factors: "(1) the sufficiency of the showing that the co-defendant would testify at a severed trial and waive his Fifth Amendment privilege; (2) the degree to which the exculpatory testimony would be cumulative; (3) the counter arguments of judicial economy; and (4) the likelihood that the testimony would be subject to substantial, damaging impeachment." *United States v. Wilson*, 11 F.3d 346, 354 (2d Cir. 1993) (quoting *United States v. Finkelstein*, 526 F.2d 517, 523-24 (2d Cir. 1975), *cert. denied*, 425 U.S. 960 [1976]).

With regard to the first factor, the defendant must provide the court with more than just speculation that a co-defendant will testify at a severed trial.  Rather, the defendant must provide the court with a declaration from his co-defendant affirming, under penalty of perjury, that the co-defendant would waive his Fifth Amendment privilege and testify on the defendant's behalf at

the severed trial.[8]  "The failure to submit a declaration affirming that a co-defendant would testify and waive his Fifth Amendment privilege warrants denial of the motion."  *United States v. Caldwell*, 07-CR-0032, 2008 WL 434595, at *3 (W.D.N.Y. Feb. 14, 2008) (citations omitted). Here, Defendant Johnson has failed to provide the Court with a declaration from Detron Parker affirming that Detron Parker would testify on Defendant Johnson's behalf at a severed trial. Rather, Defendant Johnson has merely stated in a memorandum of law that "[a]t a severed trial, Mr. Parker will be more willing to testify on Mr. Johnson's behalf and would likely waive his privilege at that point."  (Dkt. No. 27, at 2.)  As a result, the Court finds that factor weighs against severance.

With regard to the second factor, Defendant Johnson contends that Defendant Detron Parker's exculpatory testimony would not be cumulative because it cannot be obtained from any other source.  As an initial matter, the Court rejects this argument because, as stated above, Defendant Parker has failed to provide the Court with anything more than speculation that Defendant Parker will waive his Fifth Amendment right and provide exculpatory testimony at a severed trial.  In any event, as the Government argues in its memorandum of law, any such exculpatory testimony would likely be cumulative, because the Government intends to introduce, during its case-in-chief at the joint trial, the post-arrest statement of Detron Parker that "whatever you found was not [Keenan Johnson's]" (or words to that effect).  (Dkt. No. 44, at 4.) As a result, the Court finds that the second factor weighs against severance.

---

[8]      *See U.S. v. Solomonyan*, 451 F. Supp.2d 626, 651 (S.D.N.Y. 2006) (denying defendant's motion to sever because defendant "failed to submit a declaration from [the co-defendant] affirming, under penalty of perjury, that [the co-defendant] would testify on [defendant's] behalf," and therefore defendant did not "ma[k]e a sufficient showing that [the co-defendant] would testify and waive his Fifth Amendment privilege."); *United States v. Lester*, 95-CR-0216, 1995 WL 656960, at *4 (S.D.N.Y. Nov. 8, 1995) (holding that a defendant did not make a sufficient showing because she did not submit a declaration from her codefendant affirming that he would testify on her behalf).

With regard to the third factor, "[t]he Supreme Court has observed that joint trials of defendants indicted together 'play a vital role in the criminal justice system' as they 'conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial.'" *United States v. Pirro*, 76 F. Supp.2d 478, 482 (S.D.N.Y. 1999) (quoting *Richardson v. Marsh*, 481 U.S. 200, 209 [1987]) (other citation omitted).[9]   "On a number of occasions the Second Circuit has echoed this strong public policy in favor of joint trials." *Pirro*, 76 F. Supp.2d at 483 (collecting cases).  "Moreover, the presumption in favor of a joint trial is especially compelling where, as here, the crime charged involves a common scheme or plan." *Id*. (internal quotation marks and citations omitted). "Further, the cases are legion that there is a strong public interest in joint trials where, as here, the defendants are both charged in the same conspiracy." *Id*. (internal quotation marks and citations omitted).  Finally, even if the defenses turn out to be antagonistic, defendants who point the finger at each other nevertheless may be tried together since mutually antagonistic defenses are not prejudicial per se." *Id*. (internal quotation marks and citations omitted).  "Thus, even testimony at trial by a codefendant that is adverse to the moving defendant does not necessarily

---

[9]     Indeed, as the Supreme Court explained in *Richardson v. Marsh*:

> It would impair both the efficiency and the fairness of the criminal justice system to require . . . that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand. Joint trials generally serve the interests and justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability-advantages which sometimes operate to the defendant's benefit. Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.

*Richardson*, 481 U.S. 200, 210 (1987).

require severance, so long as the testimony is relevant and competent, and bears on the issue of guilt or innocence." *Id.* As a result, the Court finds that the third factor weighs against severance.

With regard to the fourth factor, Defendant Johnson argues, "It is not likely that the testimony would be subject to substantial, damaging impeachment. Little proof exists concerning any agreement between Johnson and his co-defendants, other than the agreement to drive Detron Parker to see his brother." (Dkt. No. 27, at 3.) The Court disagrees. The transcript proffered by the Government of the taped telephone conversations preceding the incident in question indicate that Defendant Detron Parker was going to FCI Ray Brook on March 8, 2009, for a reason other than "to see his brother," and that Defendant Johnson knew why he was driving Defendant Detron Parker to FCI Ray Brook on March 8, 2009.

More specifically, contained in the transcript are the following statements: (1) Johnson's acceptance of Travious' request on February 28, 2009, that Johnson drive Detron to FCI Ray Brook so that Detron could "take care of something for [Travious]"; (2) Detron's statement to Travious later on February 28, 2009, that Johnson agreed to drive him to FCI Ray Brook, and Travious' subsequent statement to Detron, "Just make sure you handle that for me"; (3) Travious' question to Detron on March 5, 2009, "What's good with that situation though?" and Detron's response, "I am gonna go ahead and do it up man. I got the jumpoff"; (4) Travious' statement to Detron on March 7, 2009, "[Y]ou gotta do everything to the T in the kite,"[10] and Detron's

---

[10]     "Kite" is a slang term used to refer to correspondence sent by, or received by, persons who are incarcerated. *See* Jonathan Green, *Cassell's Dictionary of Slang: A Major New Edition of the Market-Leading Dictionary of Slang*, at 842 (Cassell 2d ed. 2006); Urban Dictionary.com, http://www.urbandictionary.com/define.php?term=kite [last visited on July 31, 2009]. For example, the transcript indicates that, on March 5, 2009, Travious stated to Detron, "Like I told her in the kite, I don't know if you read it or not, I told her in the kite, like listen man, alright, I've been in jail . . . ."

response, "I'm about to go put the jumpoff together, like I have to put one together and shit but I got some new shit my people showed me.  I am about to get that as soon as we get off"; (5) Travious' question to Detron on March 7, 2009, "Just make sure you get a copy of the directions cause she got them.  She had already got the exact directions on how to get there"; (6) Detron's statement to Travious on March 8, 2009, "[W]e are having a little trouble trying to . . . find the jumpoff"; (7) Johnson's statements to Travious on March 8, 2009, "[T]he blue print ain't clear enough," and "[We are trying to find] [w]here we gonna stop at"; (8) Travious' statement to Detron on March 8, 2009, that the "jump off" is "right by the jail . . . right before [they] get [to FCI Ray Brook]"; and (9)  Travious' statement to Detron on March 8, 2009, "[W]hat kind of package you use? . . . Like a brown paper bag or something? . . . You aint got a brown paper bag?"  As a result, the Court finds that the fourth factor weighs against severance.

For all these reasons, the Court denies Defendant Keenan Johnson's motion to sever.

**ACCORDINGLY**, it is

**ORDERED** that Defendant Detron Parker's motion to dismiss the indictment pursuant to Fed. R. Crim. P. 12(b) based on insufficient evidence before the grand jury (Dkt. Nos. 15-16) is **DENIED**; and it is further

**ORDERED** that Defendant Detron Parker's motion to inspect the Grand Jury minutes, pursuant to Fed. R. Crim. P. 6(e)(3) (Dkt. Nos. 15-16) is **GRANTED**; and it is further

**ORDERED** that Defendant Detron Parker's motion for discovery and inspection of various information pursuant to Fed. R. Crim. P. 12(b)(4), and 16 (Dkt. Nos. 15-16) is **GRANTED in part** and **DENIED in part**, in accordance with Part V of this Decision and Order; and it is further

**ORDERED** that Defendant Detron Parker's motion to suppress any and all evidence seized by the Government from the vehicle in which he was an occupant, pursuant to Fed. R.

Crim. P. 12(b)(3) (Dkt. Nos. 15-16) is **<u>DENIED</u>**; and it is further

ORDERED that Defendant Detron Parker's  motion to suppress the statements attributed

to him pursuant to Fed. R. Crim. P. 12(b)(3) and 41 (Dkt. Nos. 15-16) is **<u>DENIED</u>**; and it is

further

ORDERED that Defendant Detron Parker's motion to direct the disclosure of all

exculpatory material, pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) (Dkt. Nos. 15-16) is

**<u>GRANTED</u>** in part and **<u>DENIED</u>** in part, in accordance with Part V of this Decision and

Order; and it is further

ORDERED that Defendant Detron Parker's motion to direct the early release of all

inculpatory material, pursuant to the Jencks Act (Dkt. Nos. 15-16) is **<u>GRANTED</u>** in part and

**<u>DENIED</u>** in part, in accordance with Part V of this Decision and Order; and it is further

ORDERED that Defendant Detron Parker's motion to direct the Government to specify

what evidence of his prior bad acts, if any, it intends to introduce at trial, pursuant to Fed. R.

Evid. 404(b) (Dkt. Nos. 15-16) is **<u>GRANTED</u>** in part and **<u>DENIED</u>** in part, in accordance with

Part V of this Decision and Order; and it is further

ORDERED that Defendant Detron Parker's motion to direct the Government to instruct

the detectives and agents on this case to preserve their original notes (Dkt. Nos. 15-16) is

**<u>GRANTED</u>** in part and **<u>DENIED</u>** in part, in accordance with Part V of this Decision and

Order; and it is further

ORDERED that Defendant Detron Parker's motion to preclude the use of the

Government's audio tapes and/or transcripts of those tapes (Dkt. Nos. 15-16) is **<u>DENIED</u>**; and it

is further

ORDERED that Defendant Detron Parker's motion to conduct an individualized voir

dire (Dkt. No. 36) is **<u>DENIED</u>**; and it is further

**ORDERED** that Defendant Detron Parker's motion to suppress the out-of-court statements of his indicted or unindicted co-conspirators as hearsay pursuant to Fed. R. Evid. 801(d)(2)(E) (Dkt. No. 41) is **DENIED in part** and **RESERVED ON in part**, in accordance with Part XI of this Decision and Order; and it is further

**ORDERED** that Defendant Detron Parker's motion, pursuant to Fed. R. Crim. P. 16(a)(1)(G), to direct the Government to disclose a written summary of any expert testimony that it intends to introduce at trial pursuant to Fed. R. Evid. 702, 703 and/or 705 (Dkt. No. 42) is **GRANTED**, and the Government shall, within **SEVEN (7) DAYS** of the date of this Decision and Order, provide to defense counsel in writing the remaining information requested by Defendant Detron Parker, including a description of the opinions of Ms. Vitale, the bases and reasons for her opinions, and her qualifications; and it is further

**ORDERED** that Defendant Keenan Johnson's motion to suppress evidence seized from the vehicle that he was driving, pursuant to Fed. R. Crim P. 12(b)(3) (Dkt. No. 20) is **DENIED**; and it is further

**ORDERED** that Defendant Keenan Johnson's motion to suppress statements made by him to law enforcement officers under *Miranda* (Dkt. No. 20) is **DENIED**; and it is further

**ORDERED** that Defendant Keenan Johnson's motion to suppress the out-of-court statements of his co-Defendants as hearsay pursuant to Fed. R. Evid. 801(d)(2)(E) (Dkt. No. 27) is **DENIED in part** and **RESERVED ON in part**, in accordance with Part XI of this Decision and Order; and it is further; and it is further

**ORDERED** that Defendant Keenan Johnson's motion to direct the Government to disclose information, pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), concerning the delivery by two females of contraband to the Ray Brook facility on the date of the arrest (Dkt. No. 27) is **GRANTED**, and the Government shall disclose to defense counsel the sum and

substance of any information regarding the incident in question within **SEVEN (7) DAYS** of the date of this Decision and Order (and any report regarding the incident generated by FCI Ray Brook before trial); and it is further

**ORDERED** that Defendant Keenan Johnson's motion to sever his action from the actions against Defendant Johnson's co-Defendants, pursuant to Fed. R. Crim. P. 14(a) (Dkt. No. 27) is

**DENIED**.

Dated: August 7, 2009
      Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge